THE DRUMM-FLATO COMMISSION COMPANY v. A. A. BARNARD *et al.*

No. 13,014. (72 Pac. 257.)

SYLLABUS BY THE COURT.

1. CHATTEL MORTGAGE—*Partial Release in Writing.* A written release of a portion of the property included in a chattel mortgage, where such release is plain and unambiguous, cannot be enlarged, contradicted or varied in its terms by parol testimony.

2. ———— *Mortgagee Held Estopped by his Release in Writing.* When a purchaser of property covered by a chattel mortgage duly recorded informs the holder of the mortgage of his purchase of like chattel property from the mortgagor, and gives a description of the property purchased, and requests the mortgagee to release all of such property on which he claims a mortgage, and the mortgagee, from a source which he deems reliable, ascertains the extent of his mortgage interest in the property so purchased,

Drumm v. Barnard.

and executes a release of a portion of the property only covered
by his mortgage, and receives the consideration agreed to be
paid the mortgagor for such portion, he will be held estopped
from afterward asserting a lien on the remainder of the property
included in his mortgage as against such purchaser.

3. ———— *Parol Testimony Admissible for Certain Purposes.*
In such case parol testimony will be received for the purpose of
proving that the mortgagee was informed by the purchaser of the
fact of his purchase from the mortgagor, and that he gave to the
mortgagee a description of the property purchased before the exe-
cution of the partial release of the mortgage.

Error from Greenwood district court ; G. P. Aikman,
judge.   Opinion filed April 11, 1903.   Affirmed.

STATEMENT.

This action in replevin was commenced October 20,
1900, by the Drumm-Flato Commission Company
against A. A. Barnard and W. E. Allis, to recover
fifty-four head of cattle claimed by plaintiff· under
a chattel mortgage made by P. L. Hale to plaintiff on
the 20th day of October, 1899, to secure a promissory
note in the sum of $9765. · The description of the
property included in the chattel mortgage, in so far as
it pertains to this case, reads as follows :

"(249) Two hundred and forty-nine head of 1 and
2 year old past native steer cattle, . . . all
branded H on left hip or J H on right hip, . . .
the same being now located on what is now known
as the Race farm about twenty miles southwest from
Madison in Greenwood county, Kansas, where they
are to be well fed through the coming winter on shock
corn, hay, etc.   And being all·the property of the
above description owned or controlled by the mort-
gagor now on said premises."

A copy of this mortgage was duly filed for record
in the office of the register of deeds of Greenwood
county on the 30th day of October, 1899.   Thereafter,
on the 14th day of December, Hale sold 201 head of

the cattle to defendants, giving a bill of sale therewith, which reads as follows :

"MADISON, KANSAS, Dec. 14, '99.
"This is to certify that I have sold to A. A. Barnard and W. E. Allis 201 one- and two-year-old steer cattle, branded C, JH, H4, part on right and part on left hip, for $6040.00, six thousand and forty dollars.
P. L. HALE."

At the time of this transaction Hale stated to defendants that the Drumm-Flato Commission Company held a mortgage on about forty head of the cattle. On the 19th day of December Hale wrote to J. H. Lampe, cattle salesman for plaintiff, the following letter :

"MADISON, KANSAS, Dec. 19, 1899.
"*Mr. J. H. Lampe, Kansas City:*
"DEAR SIR—The weather is very bad here and the roads are very bad. I sold Barnard 40 of the yearling and two-year-old cattle, out of the 249 steers ; they were the light end of the bunch, sold for $30 per head. He will send you the amount in a few days. When he does, give me credit for the same on my note ; that leaves me about 260 good steers to feed. Could I buy some good heavy cattle now to feed out on shock corn? I have more corn than I can feed. Let me know and what price and what kind they are. Where can we find your dehorning knife when we want it? Father said you thought it was all right. I have made some money this fall selling cattle for the Wright Bros. Yours truly, P. L. HALE."

On the 15th day of December Barnard wrote the following letter to Wright, Hannah & Co., the commission firm at Kansas City which transacted the commission business of defendants :

"MADISON, KAN., Dec. 15, 1899.
" *Wright, Hannah & Co., Kansas City, Mo.:*
"GENTLEMEN—Allis and I have bought 154 steers for our partnership deal at 4.35, western Kansas

native, all mulies, mostly white faces one and two-
year old, branded H on left hip and part C and a few
JH on right hip, and all branded A on left hip, being
our private brand.   These cattle are to be fed with
the other 100 at Virgil.   The total cost and weight is
154-111080-4.35-$4831.98.   These cattle were bought
of P. L Hale.   I will get his bill of sale from him
and send in with the papers.   You can make out and
we will sign.   Now I wish that you would ask Drumm-
Flato for a release on the cattle according to the sale
bill he gives.   I will see him.   I think you can pay
the money in K. C.   They are a good lot of steers.
We got a terrible shrink on them.   Paul says the H
steers are all out of A cows.   They look as though they
were out of something good.

Yours truly,      A. A. BARNARD.

"P. S.—Make the paper up to-morrow if you can.

A. A. B."

On December 20 Barnard again wrote as follows :

"MADISON, KAN., Dec. 20, 1899.

" Wright, Hannah & G., Kansas City, Mo.:

"GENTLEMEN— Please find enclosed bill of sale from
P. L. Hale for all the stuff we bought of him.   He
says Foster and Cherry are carrying 128 and Drumm-
Flato only a few head.   You can get a release from
them all.   I took out 47 of the 201 and am carrying
them in Eureka, but had the bill of sale to cover them
all.   It is late to-night and we can't get a bill of sale
form, so he did the best he could.   You may place
the balance of the money to my credit in the People's
Bank at Madison.   I 'll fix it with Hale.

Yours truly,      · A. A. BARNARD.

"Be sure and pay all that there is there and get a
release from them."

Again, on December 22, Barnard wrote as follows :

"MADISON, KANSAS, Dec. 22, 1899.

" Wright, Hannah & Gilchrist, Kansas City. Mo.:

"GENTLEMEN—You do not understand this deal.
Barnard and Allis bought 201 steers, cost $6040.00.
Barnard took 47 at weight 27770, 4.35, cost 120.02,

Barnard and Allis took 154 weight 111080 at 4.35, cost $4831.98.

"The above head and weight and cost is how the matter stands. Barnard and Allis wish you to carry 154 steers at 4831.98. I have got the 47 head carried in Eureka. He made the bill of sale to cover the whole am't of cattle. He never made out one before, neither had I, hence the shape it is in. He told me that Foster and Cherry had 128 head and that was all except a very few head of the Drumm-Flato cattle. The balance were his own, paid for out of pasture money. These steers that are called 4 brand were never branded. They were supposed to have been but never were, although they are the same cattle Foster and Cherry are carrying. . . .

Yours truly,    A. A. BARNARD."

After a conference between the representatives of Wright, Hannah & Co. and plaintiff, plaintiff executed and delivered to Wright, Hannah & Co., for defendants, the following release, which was forwarded to Barnard:

"RELEASE.

"KNOW ALL MEN BY THESE PRESENTS: That Drumm-Flato Commission Company, mortgagee, hereby releases forty (40) head of one- and two-year-old native steer cattle, branded H on left hip or J H on right hip. Out of a certain chattel mortgage executed by P. L. Hale, October 20, 1899, on 249 head of one- and two-year-old steer cattle and 93 head of other cattle of various kinds and ages. Said chattel mortgage was filed for record by the register of deeds of Greenwood county, Kansas, on October 30, 1899. Said register of deeds of Greenwood county, Kansas, is hereby authorized to release and discharge the above-described 40 head of cattle from the records.

"Kansas City, Missouri, December 23, 1899.

DRUMM-FLATO COMMISSION CO.

Per F. W. FLATO, JR., *Vice-president.*

This action was brought to recover 54 head of the

Drumm v. Barnard.

154 kept by defendants.   From the evidence there is
no doubt the cattle were located on the Race farm and
were of the ages described in the mortgage.   There is
evidence in the record tending to show that the cattle
were what is known among cattlemen as "Western"
cattle and not "native," as described in the mort-
gage.   There is also evidence in the record that a
portion of the cattle so purchased by defendants were
branded otherwise than as described in the mortgage.
There is also evidence tending to show that soon after
this deal Hale disappeared from the state and was
gone for a considerable length of time.

Upon the trial, there was a general verdict, with
judgment for defendants for the possession of the cat-
tle.   Plaintiff brings error.

*Howard J. Hodgson*, and *Botsford, Deatherage &
Young*, for plaintiff in error.

*Fuller & Jackson*, and *S. F. Wicker*, for defendants
in error.

The opinion of the court was delivered by

POLLOCK, J. :   The first contention made is that the
trial court erred in refusing to permit plaintiff to file
an amended reply, putting in issue agency, as pleaded
by defendants in their answer, except upon payment
of costs.   Under the circumstances of this case, we
are inclined to the opinion that the ruling of the court
was somewhat harsh and arbitrary, but, in view of
the conclusions reached upon the merits, this question
becomes immaterial.

Again, it is contended that error was committed in
the reception of testimony prejudicial to the rights of
plaintiff.   The material parts of this testimony, and

sufficient to disclose the nature of the question raised, read as follows ·

"Ques. Mr. Herndon, state what you did with reference to this communication and in connection with the plaintiff in this suit, the Drumm-Flato Commission Company. Plaintiff objects to this question, for the reason that the evidence will show that whatever was done was done in writing and the writing is the best evidence. Objection overruled. Plaintiff excepts. Ans. I was sent by our Mr Hannah, who is a member of the firm, to the office of Drumm-Flato Commission Company with a check for $1200 and asked them to give me a release of the cattle purchased by Barnard from Hale.

"Q. Who did you see at the office of the Drumm-Flato Commission Company? A. I saw Mr. Ewart and Mr. Burnett and I think Mr. ——— Q. Mr. Ewart and Mr. Burnett? A. Yes, sir.

"Q. Did you have any conversation there with either of these men? A. I asked Mr. Ewart if they had a release for the cattle that Barnard had purchased from Hale.

"Q. Who is Mr. Ewart? A. He is secretary of the company.

"Q. Secretary of what company? A. Drumm-Flato Commission Company.

"Q. What did he say? A. He said no——— (interrupted).

"Plaintiff objects to the conversation; they paid over this $1200 and got a written release at the time. Now, as to what was said is wholly immaterial; the release speaks for itself.

"By the Court: Confine it to that date he got the release.

"By the Court: Was he bookkeeper?

"By Attorney Jackson: Mr. Ewart is vice-president or secretary.

"Objection overruled. Plaintiff excepts.

"Q. What did he say? A. He said no; that Mr. Lampe was not in and would have to see him before he could get the release.

"Q. You say you took a check for $1200? A. I did.

"Q. Did you leave the check there? A. I did not.

"Q. Mr. Herndon, how did it happen that you took a check for this amount?

"Plaintiff objects as incompetent, irrelevant and immaterial.

"Objection sustained. Defendant excepts.

"Q. Did you go to the office of this company again? A. Yes, sir.

"Q. When did you go again? A. Later in the day.

"Q. Of the same day?. A. I think so.

"Q. Whom did you find there then? A. I found Mr. Ewart and Mr. Lampe. Mr. Lampe was there at that time.

"Q. Do you know Mr. Lampe? A. Yes, when I see him.

"Q. What connection does he have with the Drumm-Flato Commission Company? A. I do not know whether he is an officer or a stockholder; he is one of their cattle salesmen.

"Q. State what you said at that time. A. I again repeated my request for the release.

"Plaintiff objects as incompetent, irrelevant, and immaterial, and not the best evidence; that the release is the best evidence.

"By the Court: The release is only the best evidence of what is in the release. Objection overruled. Plaintiff excepts.

"A. I asked them for the release of the cattle purchased by Barnard from Hale upon which they held a mortgage.

"Q. State what was said or done at that time by Mr. Lampe, or Mr. Ewart. A. They set about to find what I wanted, after I told them.

"Q. What did they do? A. After conversing with each other and consulting their record-books, I presume it was, they got me the release and I gave them the check.

"Q. Was there anything said there about the number of cattle to be released? A. Something was said;

I do not remember, but I think they asked me if I knew the number of head.

"Q. What did you say?   A. I did not.

"Q. Did you tell them you did not?   A. I did.

"Q. Was there anything said there about any correspondence about these cattle?   A. I think there was.

"Q. Well, what was it, if you remember?   A. I think Mr. Lampe said to Mr. Ewart that he had had some correspondence in regard to it.

"Q. Did he say from whom?   A. He did not, as far as I remember.

"Q. Let me ask you, did you make out this check for $1200?   A. I think I did.

"Q. You may tell if you know who gave you the amount to put in that check?   A. Mr. Hannah.

"Q. Of your firm?   A. Yes, sir.

"Q. And he is the person that sent you here to transact this business?   A. Yes, sir.

"Q. You may look at this release, marked exhibit 'L,' and state if that is the release given to you there that day?   A. To the best of my knowledge it is."

"CROSS-EXAMINATION.

"Q. At the time you went to the office of the Drumm-Flato Commission Company to procure this release did you have in your possession the letters which have been offered in evidence from A. A. Barnard, you or your firm?   A. We had one or two of them; I could tell by referring to the date whether I had them or not.

"Q. Will you examine this release and also the letters attached to this deposition and introduced in evidence on behalf of the defendants and tell the jury whether or not at the time you went to the Drumm-Flato Commission Company you had those letters or any of them, and if so what letters?   A. I guess I had them all.

"Q. Now, Mr. Herndon, did you show any of those letters to the Drumm-Flato Commission Company or its officers?   A. I never did.

Drumm v. Barnard.

"Q. Did you say anything about what you had in those letters? A. No, sir.

"Q. Did you have that bill of sale in your possession at that time? A. No, sir.

"Q. When did you get that bill of sale? A. Just a few days after; just as Mr. Barnard says.

"Q. You testified once before in this case, did n't you? A. You took my deposition.

"Q. Did n't you say in your former examination on this question that you had the bill of sale in your possession? A. I do not remember of saying so.

"Q. At the time you got this release, paper marked exhibit 'L,' did you read it? A. The release?

"Q. Yes, sir. A. Yes, sir.

"Q. As a result of the conversation which you had at that time with the Drumm-Flato Commission Company and its officers and agents, you got this release; is that true?

"Defendant objects as incompetent, irrelevant and immaterial, and calling for a conclusion of the witness; the jury can say whether it is as a result of the conversation or not. The defendant objects to the first part as got as a result of this conversation.

"Objection sustained. Plaintiff excepts.

"Q. When did you get this release with reference to the time you had this conversation with the Drumm-Flato Commission Company? A. Afterward.

"Q. When you got this release, did you have any further conversation about releasing the cattle that you wanted to release to Barnard and Allis? A. No, sir.

"Q. What did you do with this release after you got it? A. I do not remember whether it was mailed directly to the register of deeds of this county or whether we sent it to Mr. Barnard.

"Q. I will ask you if it is not true in your deposition in this case, if you did n't testify that you sent it directly to Mr. Barnard? A. I might have; I said just now I might have.

"Q. Did you say anything in your examination about having sent it to the register of deeds? A. I do not know.

". . no t true that you did not ? A. I do not

· "Q. After you got this release did you show it to either one of the members of the firm of Wright & Hannah ? A. I did.

"Q. Did they read it ? A. I think so."

W. S. Hannah, member of the firm of Wright, Hannah & Co., testified :

"Ques. In December, 1899, as you have stated, when Paul Hale sold some cattle to the defendants, did you have any talk or correspondence with the defendants in regard to the purchase of those cattle ? Ans. The firm had some correspondence with Mr. Barnard. It is admitted by the plaintiff that the correspondence referred to consists of three letters, marked exhibits A, B, and C, attached to depositions taken in the above cause at Kansas City, before E. L. Stephenson, notary public, about March 5, 1901.

· . . .

"Q. Did you have any conversation with the plaintiff regarding the purchase of the cattle in question ? A. Yes, sir.

"Q. With whom did you have your conversation ? A. Mr. Ewart.

"Q. What relation did he bear to the company? A. I believe he was secretary of the company.

"Q. Did you have conversation with any one regarding the cattle in question, connected with the company? A. Not at that time.

"Q. You may state fully what your conversation was with Mr. Ewart regarding the cattle in question. A. My firm had received letters from Mr. Barnard in regard to the purchase of certain cattle from Paul Hale, and I went ·down to the office of Drumm-Flato Commission Company to see about paying for the cattle and procuring a release. I talked to Mr. Ewart about it, and he was unable· to give me the release at the time. I returned to my · office, and afterwards sent Mr. Ben. P. Herndon, the bookkeeper, to procure the release, by giving them a check.

"Q. The letters that you have just referred to are

the same letters heretofore referred to in your deposition? A. Yes, sir.

"Q. You may state what release you were getting from the plaintiff. Plaintiff objects, on the ground that all the conversation between these parties leading up to the giving of this release merged into the release, and, therefore, wholly inadmissible; inadmissible, what purpose he may have had in his mind for going there. By the Court: I think any conversation relating to this matter occurring between this company and its officers would be competent. Objection overruled. Plaintiff excepts. A. I was getting release for the cattle Barnard had bought of Paul Hale, on which Drumm-Flato Commission Company had a mortgage.

"Q. What number of cattle are you now referring to? Same objection. Objection overruled. Plaintiff excepts. A. Whatever the release called for.

"Q. To refresh your memory; you stated that the purchase called for about 200 head of cattle? A. Yes.

"Q. Do I understand that you were getting a release from Drumm-Flato of whatever interest they had in those 200 head of cattle? Same objection. Objection overruled. Plaintiff excepts. A. That was my understanding.

"Q. You may state whether or not that was the substance of the conversation you had with Mr. Ewart? Same objection. Objection overruled. Plaintiff excepts. A. Yes, sir, that was.

"Q. At that time, or near that time, or, to be more particular, did you have any conversation with Mr. Lampe regarding the release of these cattle? A. No, sir.

"Q. Who was Mr. Lampe, if you know? A. Cattle salesman for Drumm-Flato Commission Company, and, I believe, a stockholder in the company."

In regard to this testimony, the contention of counsel for plaintiff in error is that the release above set out was procured from plaintiff as a result of the negotiations between the representatives of plaintiff and

those of Wright, Hannah & Co., acting for defendants; that this release is plain in its language, fully expresses the agreement reached by the parties, and, in the absence of fraud, is not open to contradiction or subject to variation by the parol testimony offered. No fraud is pleaded, and there is no attempt at proof of fraud in the transaction. As we understand the position of counsel for defendants, it is not that the terms of this writing may be contradicted or varied by parol testimony of what occurred prior to, or contemporaneous with, the making of the written release, but the contention is that defendants sought information as to the extent of the chattel-mortgage interest of plaintiff in the cattle defendants had purchased from Hale for the purpose of satisfying such lien out of the contract price of the cattle; that plaintiff, upon being so advised from a source which it deemed authoritative, whether from its own records or the letter from Hale, determined the extent of their mortgage lien upon such cattle to be $1200, and it was the intention of plaintiff, by the release given and the acceptance of this sum of money, not to release its entire mortgage, but to release all of the cattle covered by its mortgage sold by Hale to defendants, and, hence, the parol evidence offered and received does not vary or contradict the writing. A majority of the court are convinced of the soundness of this contention, and hold the parol evidence offered admissible for this reason.

Complaint is made of the instructions given by the court. It is urged that the issues were not clearly defined; that the court embodied the principal part of the petition in his charge to the jury and then informed the jury that the defendants in their answer "deny each and every allegation and averment in

plaintiff's petition contained''; and again, by the
third paragraph of the instructions, charged the jury
that ''the burden is on plaintiff in this action to prove
the material and essential allegations of the petition
by a preponderance of the evidence,'' without inform-
ing the jury what allegations of the petition stood
confessed by the pleadings or what comprised the
material allegations demanding proof in their support.
But the court, in paragraph 5 of his charge, instructed
the jury as follows :

''Before the plaintiff can recover in this case it
must establish by a preponderance of the evidence the
following essential and material matters :   (1) That it
had at the commencement of this action the special
interest claimed in the property in controversy ;   (2)
that it was entitled to the immediate possession of
said property at the time this action was commenced ;
(3) that said property was unlawfully and wrongfully
kept from plaintiff by defendants.''

We are of the opinion that the jury could not have
failed to grasp the issues or understand the extent of
proof required to establish plaintiff's right of recovery.

Again, one of the principal claims of defendant below
upon the trial was that the cattle purchased by them
of Hale bore different marks and brands and were
different in description from the cattle described in
plaintiff's mortgage.   Upon this theory of the de-
fense the court instructed as follows :

''6. The note and mortgage sued on are valid in-
struments upon their face, and, as between the mortga-
gee and a third party, are valid, and impart sufficient
notice of the lien on the property therein named,
if there is such property in fact, as described therein,
corresponding with such description, or if not fully
and truly described, yet if the description is sufficient
to furnish such suggestions that one examining the
mortgage itself by the suggestions therein given can

know and identify the property as the property mortgaged, as more fully explained in instruction No. 7 herein.

"7. The jury are instructed that in order for the description contained in the chattel mortgage to be sufficient to impart notice to purchasers without actual knowledge of the existence of the mortgage, or the identity of the property, it should describe the property with reasonable particularity, and must be such that third persons, aided by the inquiries which the mortgage itself suggests, would be able to identify the property as the property described in the mortgage."

This being an issue in the case, the instructions being unobjectionable in form, and there being some evidence in the record to support the instruction given, we perceive no error therein.

In the eighth instruction the court declared the law as follows :

"The jury are further instructed that if, by the terms of the mortgage the property described therein is left in the possession of the mortgagor, and the mortgagee knowingly consents that the mortgagor may sell said property and receive the proceeds therefor, then the mortgagor becomes the agent of the mortgagee to sell said property, and a person buying the same will acquire the said property free and clear of any incumbrance of said mortgage."

The argument made against the giving of this instruction is that there was no evidence in its support. No question is raised by counsel, and no objection urged, either to the form of the instruction or that it is unsound as a legal proposition. We have read the evidence, and from the prior course of dealing between Hale and the plaintiff, as shown by the record, and the testimony of Hale as well, we find there was some evidence, tending to authorize an instruction

along the line of that given, conceding the law to be as here declared.

Bitter complaint is made of paragraphs 9 and 10 of the instructions, which read:

"9. A purchaser of property upon which a mortgage lien is claimed has a right to rely upon the statement of the holder of that claimed lien, and if you find that the defendants in this case, through their agents, stated to the plaintiff that they wanted a release from said mortgage for the cattle purchased by defendants from said Hale and covered by said mortgage, and you should further find that the plaintiff, after an investigation from a source it deemed proper, stated that forty head of cattle were all it claimed of said cattle, and the defendants being induced by said representations to believe said statements, and relying thereupon fully, consummated said sale and paid out all of the purchase-price for said cattle, a part of which was paid this plaintiff, being the amount claimed by plaintiff as due them, then, in that case, the plaintiff would be estopped from claiming a further lien on the property.

"10. If you find from the evidence in this case that defendants purchased from P. L. Hale certain cattle which had been mortgaged by said Hale to the plaintiff and on which plaintiff at that time held a mortgage, and that afterwards the defendants paid or caused to be paid to plaintiff a certain amount of money, which it was intended by defendants and plaintiff should be in full payment for a release of the interest that plaintiff had therein by reason of a chattel mortgage thereon, given by said P. L. Hale to plaintiff, and that the cattle in controversy are a part of all said property so intended to be released, then, in that case, the cattle in controversy would be fully released, although the release in writing failed to describe fully the cattle intended to be released."

One of the principal objections urged to the giving of this portion of the charge is that there was no evidence found in the record upon which the doctrine of

estoppel can rest. The evidence upon this branch of the case is above set forth. The further objection made is that defendants were not misled to their injury by any act of plaintiff; that the release is plain and unambiguous in its terms; that defendants could not have been deceived as to its import or the extent to which plaintiff relinquished its lien upon the cattle covered by its mortgage; and that this release came into the hands of defendants before they parted with any portion of the purchase-money which they contracted to pay Hale for the cattle, except the $1200 paid plaintiff at the time the release was obtained. A majority of the court incline to the opinion there is sufficient in the evidence to show that plaintiff was informed of the number and description of the cattle purchased by defendants from Hale; that plaintiff was requested to furnish a release of its mortgage on all the cattle so purchased on which plaintiff held a lien, and, in compliance with this request, they received the $1200 and gave the release in question. In this view of the case, there was evidence to warrant the giving of this portion of the instruction, and the doctrine of estoppel was rightly presented to the jury.

Again, complaint is made of the giving of instruction No. 11, which reads as follows:

"If you find that the indebtedness, the note and mortgage sued on, have been paid, then in that case your verdict should be for the defendants."

The accounts between Hale and plaintiff were complicated, Hale claiming larger credits than he had received. While there was slight evidence to support the giving of this instruction, yet we cannot say from the evidence in the record that there was absolutely no proof upon which such instruction might be based.

Complaint is also made of the refusal to give cer-

Drumm v. Barnard.

tain instructions requested by counsel for plaintiff. In the view of the case taken by the court, the instructions given by the trial court fully cover the issues submitted to the jury. There was, therefore, no error in refusing the instructions asked.

It follows that the judgment must be affirmed.

JOHNSTON, C. J., CUNNINGHAM, GREENE, MASON, JJ., concurring.

POLLOCK, J. (dissenting) : The foregoing is the opinion of the majority of the court. It does not express my views. I agree with neither the conclusion reached nor the law as declared, save in the first point of the syllabus and corresponding portion of the opinion. To my mind, the case was largely tried upon false issues. The important question, the ultimate rights of the parties, was entirely lost sight of and not considered.

Plaintiff held a chattel mortgage admittedly valid as between it and Hale, the maker. This mortgage was of record. It was not contended, and could not be successfully urged, that this mortgage was void for insufficient description, or other cause. The only possible controversy, therefore, which could arise between defendants, as purchasers of the mortgaged property, and plaintiff, was, Did this mortgage, of the existence of which defendants had both actual and constructive notice, inform defendants of the fact that plaintiff had a mortgage on the cattle they were purchasing ? That is, could defendants, from the description of the property in the mortgage, aided by inquiry which the mortgage suggested, have identified the property ? If so, defendants knew the cattle were mortgaged when they purchased and cannot now be heard to assert to the contrary. ( *Waggoner v. Oursler*, 54 Kan. 141, 37

Pac. 973 ; *Schmidt v. Bender*, 39 id. 437, 18 Pac. 491 ; *Crisfield v. Neal*, 36 id. 278, 13 Pac. 272.)

What was the evidence? The uncontroverted facts are these : The cattle described in the mortgage were located on the Race farm about twenty miles southwest from Madison, in Greenwood county, in the possession of Hale. The cattle purchased by defendants were, when purchased, in the possession of Hale, on the Race farm, as located in the mortgage. The cattle described in the mortgage were 249 head of one- and two-year-old steer cattle owned by Hale. The defendants purchased from Hale 201 head of one- and two-year-old steer cattle. Can it be contended, in the face of these admitted facts, that defendants did not know, or could not, by inquiry based upon known facts, have ascertained, that the cattle they purchased were encumbered by plaintiff's mortgage? This court, in *Waggoner v. Oursler*, supra, held :

"A description in a chattel mortgage which gives the age, sex, ownership and location of a number of cattle is held to be sufficient, under the circumstances, to enable third parties to identify those intended to be mortgaged with reasonable certainty, and to charge them with notice of the lien."

Again, the mortgage distinctly stipulates the 249 head of steer cattle, one- and two-year-old past, to be all the property of that description owned or controlled by the mortgagor then on said premises. The only controversy attempted to be raised by defendant was that the cattle were not "native" cattle, as that term is employed among cattlemen, but were "Western" cattle ; also, that a portion of the cattle were not branded as specified in the mortgage. Admitting this to be true, yet it is clear that defendants must have known, and did know, from the description given in

the mortgage, that the cattle they purchased were the cattle mortgaged to plaintiff.

The second defense relied on is based upon the doctrine of equitable estoppel or estoppel *in pais*. This defense concedes the mortgage of plaintiff to have been a valid lien on all of the cattle purchased. The theory of defendants is this, that, knowing of the mortgage of plaintiff, and the extent of its mortgage interest, they informed it of the purchase and requested a release of its mortgage interest on the cattle purchased, paid the sum of $1200, and obtained the release in question. Wherefore, it is contended that plaintiff is now estopped to assert a lien on the remainder of the cattle described in its mortgage. It is the settled law of this and other jurisdictions that the release in question cannot be enlarged, contradicted or varied by parol testimony. This is declared in the opinion. See, also, *Felix v. Railway Co.* 60 Kan. 467, 57 Pac. 128 ; *Lehigh Val. Transp. Co. v. Miller et al.*, 8 C. C. A. 188, 59 Fed. 483 ; *Jones v. Jones*, 46 Iowa, 466 ; *D. & R. G. R. Co. v. Sullivan*, 21 Colo. 302, 41 Pac. 501 ; *Van Bokkelen v. Taylor et al.*, 62 N. Y. 105 ; *Brady et al. v. Read*, 94 N. Y. 631 ; *Hitt &c. v. Holliday &c.*, 2 Littell (Ky.) 333.

It being clear, from the express terms of the release, that only a portion of the cattle purchased by defendants were released from the lien of the mortgage, I am at a loss to understand how the doctrine of estoppel may arise thereon. If through inadvertence or mistake the entire mortgage lien of plaintiff had been released, and thereafter defendants had completed their purchase from Hale by payment of the purchase-price without knowledge of the mistake, relying on the written release, the doctrine of estoppel might well be urged. Or, if the entire purchase-price

of the cattle had been paid to plaintiff upon an agreement that a full release of its mortgage should be furnished, and plaintiff had fraudulently released only a portion of its lien, it might well be held estopped; but in this case, as a result of negotiations, plaintiff received a small sum of money in comparison with the entire mortgage debt, and executed the partial release in question, definite in its terms, and yet it is held estopped from making further claim under its mortgage; not from the terms of the release executed, for that is partial only; not because defendants paid over the purchase-money, relying on a complete release of plaintiff's mortgage, for they paid Hale nothing until after receiving the partial release; not on account of the fraudulent conduct of plaintiff, for there was no fraud of plaintiff either pleaded or proved. Upon what possible theory of law or what imaginable conduct of plaintiff may the doctrine of estoppel then be predicated?

Mr. Bigelow, in his work on Estoppel, fifth edition, page 569, prescribes the essential elements of estoppel *in pais*, or equitable estoppel, as relied on in this case, as follows:

"To constitute this particular estoppel by conduct, . . . all the following elements must be present:

"1. There must have been a false representation or a concealment of material facts.

"2. The representation must have been made with knowledge, actual or virtual, of the facts.

"3. The party to whom it was made must have been ignorant, actually and permissibly, of the truth of the matter.

"4. It must have been made with the intention, actual or virtual, that the other party should act upon it.

"5. The other party must have been induced to act upon it."

This statement of the essential elements of estoppel has been adopted and approved by the courts in all jurisdictions, and was expressly approved by this court in *Kraft v. Baxter*, 38 Kan. 351, 16 Pac. 739. Applying this test to the facts presented by the record in this case, what conclusion must be reached? Is there a single essential element of estoppel presented here? It is not even contended that plaintiff made any representations concerning its mortgage lien except those expressed in the release and mortgage. Its mortgage was of record; the release speaks for itself. Hence, plaintiff represented nothing found to be untrue—concealed nothing from defendants. The essential elements 1, 2 and 4 are, therefore, lacking in this case. The defendants had both actual and constructive notice of plaintiff's mortgage. They had the release in their possession before parting with any part of the purchase-money to Hale, and, after its reception and knowledge of its contents, paid over the purchase-price and remained quiet for almost two years thereafter, and until this action was brought. Hence, the remaining essential elements of estoppel are wanting in this case. This is a case where not only one of the essential elements of equitable estoppel is wanting, but there is present not a single element of estoppel.

But it is contended that defendants requested a release of all of plaintiff's interest in the cattle they had purchased, and, therefore, the release received, while partial in terms, operates as a release of the whole. I fully confess my inability to understand this argument. It is not contended that the entire mortgage debt, or any considerable portion of it, was paid or offered to be paid to plaintiff. Defendants received, read, understood, retained and acted upon this par-

tial release, and cannot now be heard to say that it is not what they bargained for. To my mind it is entirely too plain for argument that the very purpose of the oral testimony introduced by the defendants was to enlarge the terms of this written release to make the instrument, partial in terms, entire in effect; to make it speak that which it does not, and will not, say. This evidence, upon all well-settled rules of practice, was erroneous and should have been excluded.

For all these reasons the judgment should be reversed.

I am authorized to say that Mr. Justice SMITH and Mr. Justice BURCH join me in this dissent.